CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**MAY 3 1 2019**

JULIA C. DUDLEY, CLERK
BY: ~~_____~~
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

UNITED STATES, and

COMMONWEALTH OF VIRGINIA

*ex rel.*

[UNDER SEAL]

Plaintiffs,

     vs.

[UNDER SEAL]

Defendant.

Civil Action No.: 6:19cv00038

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730
(False Claims Act)

**DO NOT ENTER IN PACER**
**DO NOT PLACE IN PRESS BOX**

## FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

UNITED STATES, and

COMMONWEALTH OF VIRGINIA

*ex rel.* John Paul Neblett
      3035 Sedgewick Drive
      Lynchburg, Virginia 24503-3333

Plaintiffs,

v.

Centra Health Inc.
1937 Thomson Drive
Lynchburg, VA 24501


Defendant.

Civil Action No.: 6:19CV00038

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730
(False Claims Act)

**DO NOT ENTER IN PACER**
**DO NOT PLACE IN PRESS BOX**

### COMPLAINT AND JURY TRIAL DEMAND

    1.     This is a civil action by Plaintiff-Relator John Paul Neblett ("Relator" or "Neblett"), by and through undersigned counsel, who files this Complaint on behalf of himself, the United States of America, and the Commonwealth of Virginia, against Defendant Centra Health Inc. ("Centra" or "Defendant") for damages and civil penalties arising out of the Defendants' collective violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) and the relevant statutes in the various states.

    2.     Defendant commits at least two types of fraud.

1

3.      First, Defendant knowingly falsifies provider eligibility documentation required by government programs, including Medicare, Medicaid, Tricare and other federally and state funded healthcare programs ("Government Programs").

4.      Government Programs require that all providers give their original signature to certifications and agreements establishing their eligibility to participate in and bill Government Programs. These provider agreements set the foundation for a provider's participation and are material to a provider's right to bill and collect payment from Government Programs.

5.      Defendant, as described below, uses a cut-and-paste method to fraudulently impress provider signatures on provider agreements, turning these critical documents into art projects.

6.      Since providers do not actually sign the provider agreements, they are ineligible to bill to Government Programs from the outset, and therefore, every bill to a Government Program flowing from these forged provider agreements is de facto a false claim for payment, regardless of whether the services were actually performed and/or regardless of whether the services performed were medically necessary.

7.      Second, Defendant knowingly withholds and fails to self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Government Programs.

8.      Defendant has received overpayments stemming from thousands of claims dating back to at least 2014 and continuing until the present, totaling potentially millions of dollars or more in unreturned payments owed to Government Programs.

9.      Relator made repeated efforts to stop the above frauds from taking place.

2

10.     Defendant admitted that it forges signatures, but claimed "no harm no foul" and stated it would correct the forgeries.

11.     Yet, Defendant in reality did nothing, and to this day Defendant forges signatures on provider agreements routinely.

12.     Defendant knows of the overpayments but has done nothing to return them.

13.     Defendant initially thanked Relator for disclosing the illegal conduct described herein. However, soon thereafter, Defendant deemed Relator a "problem" and terminated him, in retaliation for his whistleblowing.

## JURISDICTION AND VENUE

14.     This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. This case arises from the wrongful conduct of the Defendants incident to obtaining funds from the federal government.

15.     This Court has personal jurisdiction over the Defendant under 31 U.S.C. § 3730(a), which authorizes nationwide service of process and because the Defendant has at least minimum contacts with the United States.

16.     31 U.S.C. § 3732(a) provides: "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in any proscribed by section 3927 occurred." (b) Venue is proper in the Commonwealth of Virginia in that, among other things, Defendant is incorporated in and regularly transacts business within the Commonwealth.

17.     Relator pre-disclosed the core facts and claims to the United States Attorney's Office for the Western District of Virginia on May 6, 2019.

3

18.     As part of the credentialing leadership team at Centra, Relator has insider knowledge of the information contained herein and is an original source. The government would not have known about this fraud, its details, and its breadth and scope, without the personal knowledge provided by the Relator.

## PARTIES AND ENTITIES

### *Relator John Paul Neblett*

19.     Relator John Paul Neblett is a resident of Lynchburg, Virginia.

20.     Relator worked in the credentialing department at Centra from July 27, 2018 until his retaliatory termination on February 28, 2019.

21.     Relator holds a series "7" license.  Relator has over fifteen years of credentialing related experience, including over a dozen years in the medical industry.

22.     Relator became aware of the frauds described herein while serving in his role in the credentialing department.

23.     Relator made numerous efforts to correct the frauds alleged herein, to no avail.

24.     Relator continued to personally observe the ongoing fraud until his retaliatory termination.

### *Defendant Centra*

25.     Defendant Centra is a Virginia billion dollar non-profit corporation which owns and operates two Lynchburg acute care hospitals, four long-term care facilities, one long-term acute care hospital, a residential psychiatric treatment facility for children and adolescents, 12 specialty education facilities, outpatient treatment facilities, a foundation, a medical insurance company, and an indemnity insurance company.

4

26.    In 2017, Centra's financial records showed it received more than a half billion dollars from Medicare and Medicaid. It recorded excess revenue over expenses of $62.2 million that same year.

27.    In 2018, Centra set aside $7.8 million to cover liability over potential violations of the Stark and Anti-Kickback laws. These potential violations arose as Defendant was negotiating settlement of other potential violations it voluntarily disclosed to the Department of Justice.

## LEGAL BACKGROUND

### A.  False Claims Act ("FCA")

26. The FCA provides in, pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or Fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a False record or statement material to a false or fraudulent claim;
>
> (a)(1)(C) conspires to defraud the Government by getting a false or Fraudulent claim allowed or paid; or
>
> ...
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> ...
>
> is liable to the United States for any civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-401, [which is currently not less than $10,957 and not more than $21,916] plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729.

5

27.     For purposes of the False Claims Act, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b).

28.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

29.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

30.     The FCA contains an independent requirement to correct errors that will cause, or have caused, a government overpayment. The Act attaches liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government. 31 U.S.C. § 3729(a)(1)(G).

31.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), the FCA civil penalties were adjusted to not less than $10,957 and not more than $21,916.

6

## B. *Federal and State-Funded Health Care Program Eligibility*

### i.     The Medicare Program

32.     Medicare is a federally-funded health insurance program administered through Centers for Medicare and Medicaid ("CMS").

33.     Medicare is divided into four major components, all of which are relevant to this action. Part A pays for skilled nursing facility stays, inpatient hospital stays, hospice care, and home health visits. Part B covers physician visits, outpatient services, preventive services, and home health visits. Part C, the MA program, allows beneficiaries to enroll in a private health organization, such as a HMO, and receive all Medicare benefits. Part D is the voluntary, subsidized outpatient prescription drug benefit.

34.     To administer the Medicare program, private insurance companies act as agents of the HHS, making payments on behalf of program beneficiaries and providing other administrative services. 42 U.S.C. §§ 1395h and 1395u. These companies are called "carriers." *See* 42 C.F.R. §§ 421.5(c). Through local carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage. This information is available to providers who seek Medicare reimbursement.

35.     Medicare reimburses health care providers for the costs of providing covered health services to Medicare beneficiaries. *See* 42 U.S.C. § 1395x(v)(1)(A).

36.     To bill Medicare Part A, a provider must submit an electronic or hard-copy claim form called the UB-04 (also known as the CMS 1450) to the appropriate Medicare carrier. To bill Medicare Part B, a provider must submit an electronic or hard-copy claim form called the CMS 1500 to the appropriate Medicare carriers. These forms describe, among other things, the

7

provider, the patient, the referring physician, the services(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.

37.     In addition, each Medicare provider must sign a provider agreement and by so doing must agree to comply with all Medicare requirements including the fraud and abuse provisions. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

38.     The provider agreement must be originally signed and cannot be forgeries, fakes, copies or cut-and-paste signatures. 42 CFR § 489.11.

39.     At all times relevant to this action, the Government Programs reviewed and approved any one of the claims at issue in this case based their review upon the provider agreements, enrollment information and claim information provided by the Defendants and relied on the veracity of that information in determining whether to pay the claims submitted by Defendants.

40.     As a prerequisite to payment, Medicare also requires providers to submit annually a Form CMS-2552-10 (previously form HCFA-2552), more commonly known as the Hospital Cost Report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

41.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or responsible designee of the administrator. Through this certification, the provider confirms that the cost report is "a true, correct, and complete statement" and that the services identified "were provided in compliance with [the laws and regulations regarding the provision of the health care services]."

### ii.     The Medicaid Program

42.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients. Funding for Medicaid is shared between the federal government and those states participating in the program.

43.     Federal regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the items and services for which the federal government will pay through its funding of state Medicaid program.

44.     Each provider that participates in the Medicaid program must sign a provider agreement with his or her state, certifying that they will comply with Medicaid rules and requirements.

45.     The provider agreement must be originally signed and cannot be forgeries, fakes, copies or cut-and-paste signatures. 42 CFR § 489.11.

46.     Centra participates in the Virginia Premier Medicaid Program.

### C.  *__The 60-Day Overpayment Rule__*

47.     Overpayments under the statute are defined as payments received in excess of amounts properly payable under Medicare and Medicaid statutes and regulations. Overpayment can occur due to a variety of reasons, including fraud, mistake and negligence. Most overpayments commonly occur when there is insufficient documentation; medical necessity errors; duplicate payments; upcoding; and/or administrative and processing errors.

48.     An identified overpayment is a debt owed to the government. Thus, the federal statute requires health care providers to recover all identified overpayments by reporting and returning overpayments within sixty (60) days after the date on which the overpayment is identified. The Affordable Care Act ("ACA") provides, in pertinent part:

### SEC. 1128J. MEDICARE AND MEDICAID PROGRAM INTEGRITY PROVISIONS

(d) REPORTING AND RETURNING OF OVERPAYMENTS –

(1) IN GENERAL – If a person has received an overpayment, the person shall –
    (A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.
    (B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

(2) DEADLINE FOR REPORTING AND RETURNING OVERPAYMENTS – An overpayment must be reported and returned under paragraph (1) by the later of –
    (A) the date which is 60 days after the date on which the overpayment was identified; or
    (B) the date any corresponding cost report is due, if applicable.

(3) ENFORCEMENT – Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31, United States Code) for purposes of section 3729 of such title.

(4) DEFINITIONS – In this subsection:
    (A) KNOWING AND KNOWINGLY – The terms "knowing" and "knowingly" have the meaning given those terms in section 3729(b) of title 31, United States Code.
    (B) OVERPAYMENT – The term "overpayment" means any funds that a person receives or retains under title XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such title.

*See* Pub. L. 111-148. ACA was amended by the Health Care Education Reconciliation Act of 2010 (Pub. L. 111-152).

49.     In practice, should providers identify an overpayment, which can date back to six (6) years of the date the overpayment for the claim was received, also referred to as the "look back period," the provider is required to promptly report and return the overpayment to the government as outlined above in Section 1128J(d) of the Social Security Act.

50.     Under Medicare Part A and B, to report and return overpayments, providers are instructed to use existing processes. Specifically, the rule states that providers and suppliers must use an applicable claims adjustment, credit balance, self-reported refund process, or other appropriate process to report and return Medicare Parts A and B overpayments.

51.     Regardless of the process used, the refund should include an explanation of the statistical sampling methodology used if an overpayment was calculated by extrapolation.

52.     In addition to the federal statute, on February 12, 2016, CMS published the 60-Day Overpayment Rule (effective March 14, 2016) implementing Section 6402(a) of the ACA, to provide clarity to the 2010 legislative provision requiring providers to report and return overpayments within the specific timeline. 42 C.F.R. § 401,405 (2016).

53.     The 60-Day Overpayment Rule, which implements Section 1128J(d) of the Social Security Act ("the Act"), entitled "Reporting and Returning of Overpayments," requires federal overpayments for healthcare services to be reported and returned by the later of: (1) sixty (60) days after identifying the overpayment or (2) the date any corresponding cost report is due, if applicable. Section 1128J(d) of the Social Security Act, codified at 42 U.S.C. § 1320a-7k(d).

54.     Specifically, the 60-Day Overpayment Rule requires that any "overpayment" must be returned within 60 days of being "identified." An overpayment is identified "when the person has or should have, through exercise of reasonable diligence, determined that the person

11

has received an overpayment and quantified the amount of the overpayment." 42 C.F.R. §

401,405 (2016).

  55. The standard for the identification of an overpayment relies upon providers

exercising "reasonable diligence." CMS describes the standard to include proactive compliance

activities conducted in good faith by qualified individuals to monitor for the receipt of

overpayments and investigations conducted in a timely manner by qualified individuals in

response to obtaining credible information of a potential overpayment. *Id.*

  56. CMS describes "credible information" as including "information that supports a

reasonable belief than overpayment may have been received. *Id.*

  57. The 60-day clock begins to run when either the provider's proactive efforts to

investigate identified overpayments, conducted with reasonable diligence, or, on the day the

provider received credible information of a potential overpayment if the provider or supplier

failed to conduct reasonable diligence and received an overpayment.

  58. Any overpayment failed to be reported to CMS and retained after the 60-day

deadline is a violation of the False Claims Act, also referred to as a "reverse false claim." 42

U.S.C. § 1320a-7k(d). Since the 60-Day Overpayment Rule, providers are also strictly subject to

the six year "lookback period," which applies to overpayments for claims received before the 60-

Day Overpayment Rule's effective date (March 14, 2016), but after the ACA's enactment

(March 23, 2010).

  59. An "obligation" under the statute can be a certain, ascertainable amount owed, or

it can be when a potential overpayment is identified, but the precise amount due it not yet

determined. The "obligation" therefore, "arises across the spectrum of possibilities from the

fixed amount debt obligation where all particulars are defined to the instance where there is a

relationship between the Government and a person that 'results in a duty to pay the Government money, whether or not the amount owed is yet fixed.'" S. Rep. No. 111-10, at 14 (2009), *reprinted at* 2009 U.S.C.C.A.N. 430, 441.

60.     In sum, the federal statutory provisions and the CMS 60-Day Overpayment Rule are provided to explicitly prevent health care providers from simply ignoring evidence of potential overpayments, triggered from improper claims billing processes. Even absent the 60-Day Overpayment Rule, providers have been subject to the provisions under Section 1128J(d) of the Act, since 2010.

## FACTS AND ALLEGATIONS

### *Forged Cut-And-Paste Provider Signatures*

61.     Since at least 2012 and continuing to the present, Defendant engages in pervasive and deliberate fraudulent practices by forging provider signatures on provider agreements used by Government Programs to determine eligibility.

62.     A "Welcome Packet" sent to providers by Centra tells them that the credentialing department will submit enrollment applications with participating payers. It instructs them to sign in blue ink and adds: "… do not date any of the forms as our payers require the specific date on which the application is submitted."

63.     Centra includes up to nine copies of the Section 15 of the Medicare certification statement with this Welcome Packet and asks the doctors to sign every one. Most providers simply sign the forms and leave the date blank. Few ever ask why there are so many copies. These signed forms then are added to the file cabinets.

64.    These cabinets contain thousands of signed and undated blank forms – some for doctors who are no longer associated with Defendant – arranged in folders, which Relator learned after working in the file room during his first weeks on the job.

65.    In July 2018, credentialing specialist Christine Wright trained Relator to cut provider signatures from signed and undated CMS forms and paste them on Medicare, Medicaid, Tricare and other government program enrollment applications and state-required paperwork showing that doctors were supervising mid-level providers such as nurse practitioners.

66.    Relator's work kit included glue sticks, scotch tape and scissors.

67.    Once Relator was finished with what Wright called the "arts and crafts" projects, Wright told Relator to mask the sharp edges left by scissors and extra lines visible in jury-rigged signature blocks by faxing the completed and "signed" form to insurers.

68.    The raw material for these faked signatures is stored in a series of overflowing file cabinets housing Medicare forms signed, but not dated, by practitioners. These bulging file drawers contained up to nine signed copies for individual Centra providers.

69.    When a signature is needed, credentialing staff pull a signed form from the file drawers, cut out the signature and paste it onto the signature block, even though the applications required an original signature.

70.    The Medicare certification application, for example, says: "All signatures must be original and signed in ink (blue ink preferred). Applications with signatures deemed not original will not be processed. Stamped, faked or copied signatures will not be accepted."

71.    Relator personally observed many thousands of faked or unsigned forms for many hundreds of providers.

14

72.     For example, there are 11 copies of undated certification forms signed by Dr. Saha Pavela; 5 copies of undated certification forms signed by Dr. Mitra Sahebazamani; and, 3 copies of forms signed by Dr. Kaneez Salbia.

73.     The number of copies by doctor differ, most likely because the credentialing staff destroy chopped-up copies after the cutting and pasting signature blocks.

74.     These so-called "short cuts" are ingrained in the training, the protocol and the daily operation of the credentialing department, which verifies the license information for providers working in the non-hospital operations of Centra and then enrolls them in insurance programs.

75.     Relator's work kit included glue sticks, Scotch tape and scissors. His unit required healthcare providers to sign multiple copies of blank, undated certification forms which supplied signatures for the cut and paste operation. Staff are trained to hide evidence of scissor cuts by faxing the completed forms.

76.     The use of these cut and paste signatures is not limited to Medicare enrollment forms.  These re-purposed signings are affixed to enrollment forms for Medicaid, Tricare and wide array of filings that, among other things, detail what physician would be supervising the work of mid-level providers such as nurse practitioners.

77. One example of a faked signature is the following:



15

78.     A review of the signature block (above) shows lines at the sides of Lisa Feagan's signature where it was cut and pasted from a blank, signed and undated form by Christie Wright, the Centra staffer who trained Relator.

79.     In the fall of 2018, Josh Larkin, the payer credentialing manager, instructed Relator to send signatures of anesthesiologists to the Bolder Healthcare Group, a revenue cycle management firm that specializes in improving the financial performance of healthcare providers.



80.     At Defendant's direction, Relator provided via e-mail at least a half-dozen signatures to Bolder Healthcare. All were cut from the existing blank forms, including the signature of Dawn Kent, a CRNA (above).

81.     As an another example, below are images which compare signatures from the credentialing documents submitted to insurers by Centra and the actual signature of supervisor Sonya Davis, the health care group's delegate official authorized to sign the applications. The signature block says: "All signatures must be original and signed in blue ink."

**Authentic Signature:**

Delegated or Authorized Official's Signat

Figure 1 Source: Cynthia Bender App

**Non-Authentic Variant Types:**

ial's Signature (First, Middle, Last Name, Jr., S

al and signed in blue ink. Applications with:

Figure 2 Source: Brian Freeman Application

gnature (First, Middle, Last Name, Jr., Sr., M.D., etc.)

signed in blue ink. Applications with signatures dise

Figure 3 Source: Tahrinia Brady App

Delegated or Authorized Official's Signatur

Figure 4 Source: Raphael Rojano App

ure (First, Middle, Last Name, Jr.,

ad in blue ink. Applications with

Figure 5 Source: James Hataway App

rized Official's Signature (First, Middle, Last

st be original and signed in blue ink. Applica

Figure 6 Source: Kimberly Parr Application

legated or Authorized Official's Signature (F.

ll signatures must be original and signed in

Figure 7 Source: James Robertson Application

82.    Relator brought his concerns to his supervisors, the human resources director and compliance officer. On January 21, 2019, he outlined them in detail to Jenny Keith, the director of corporate compliance for Centra Health, in an email.

83.    Two other credentialing packages processed and sent by Larkin – Relator's immediate supervisor – were submitted to compliance as well. Relator explained that these signatures weren't copied, as Larkin forged and falsified both of the signatures:

17



84.     As additional evidence, Relator provided the human resources and compliance departments with copies of faked signatures on the compliance packet of Dr. Kevin Bergeson Knight. Relator provided copies of the actual signature of Dr. Knight and the actual signature of Larkin.

85.     Just an hour after making his disclosures, Shannon Meadows, the Director of Human Resources replied, thanking Relator for his candor and stating, "We are investigating this thoroughly."

86.     Nine days earlier, after an internal investigation, Keith substantiated two of Relator's three allegations and continued to investigate a third.

87.     The internal investigation by Defendant's corporate compliance concluded that some signatures were not cut and pasted. They were forged. She wrote: "The second area of concern you had was surrounding the signatures on the Medicare Enrollment Forms (855i). The Chief Compliance Officer and myself have interviewed the appropriate individuals and substantiated your allegations. Please note that Mr. Larkin, nor anyone else in the office, will be signing on behalf of Ms. Davis. This practice will stop immediately."

88.     "The third area of concern you had was surrounding the practice of cutting and pasting provider signatures on various forms. The Chief Compliance Officer and myself have interviewed the appropriate individuals and substantiated your allegation. Please note that the practice of 'cutting and pasting' signatures will stop immediately."

18

89.     However, Defendant did not "stop immediately" and in fact, continues these practices to this day.

90.     The above are simply examples of a widespread institutionalized fraud Centra has been committing and continues to commit into the present day.

91.     Centra's revenue from Government Programs exceeds a half of a billion dollars annually.

92.     Every single claim for payment stemming from any forged/faked signed provider agreement is false.

93.     Therefore, every payment made from Government Programs to Centra for services performed (or billed by) any provider whose signature was forged/faked (including the providers named above) should be returned to Government Programs as they were obtained because Centra fraudulently induced the payments in the first place.

94.     Thus, damages to Government Programs for Centra's faked/forged signature fraud is in the hundreds of millions and perhaps billions of dollars.

### *Failure to Report and Unlawful Retention of Identified Overpayments*

95.     In September 2018, Centra transferred its claims management and billing operations from Athena Health to Cerner Corporation, a health information, electronic healthcare record and revenue management company.

96.     As the transition from one information system to another came closer, Centra pushed to reduce any outstanding balances.

97.     Centra told Relator and other employees in his section that it was critical to reduce these balances as Cerner's fee would be based, in part, on the amount of the balance transferred.

98.     Relator reviewed Centra's accounts as directed and discovered that outstanding balances dating back to 2014 were more than $7 million.

99.     By February 2019, the outstanding accounts totaled 33,178 claims with a balance of more than $5.3 million.

100.    Specifically, unreturned overpayments still in Centra's accounts from 2014-2018 that Relator could identify prior to his termination are as:

| Insurer | Outstanding Balance | Number of Claims | Year |
|---|---|---|---|
| Medicaid | $10.68 | 1 | 2014 |
| Medicare | $195.98 | 2 | 2014 |
| Medicaid | $1,400.66 | 34 | 2015 |
| Medicare | $3,349.33 | 57 | 2015 |
| ChampVA | $23.42 | 1 | 2016 |
| Medicaid | $5,003.74 | 89 | 2016 |
| Medicare | $4,438.85 | 98 | 2016 |
| Tricare | $87.83 | 1 | 2016 |
| ChampVA | $667.03 | 12 | 2017 |
| Medicaid | $28,380.79 | 558 | 2017 |
| Medicare | $94,313.43 | 1232 | 2017 |
| Tricare | $4,406.02 | 91 | 2017 |
| ChampVA | $73.82 | 3 | 2018 |
| Medicaid | $30,512.08 | 628 | 2018 |
| Medicare | $23,377.91 | 1001 | 2018 |

| Tricare | $1,961.15 | 142 | 2018 |
|---------|-----------|-----|------|
| **Total** | **$198,202.72** | **3,950** | |

101.   These overcharges represent 3.6 percent of the $5.3 million in outstanding claims from the data Relator reviewed, and this is just a sample of outstanding claims.

102.   Relator assessed that overpayments stem back until at least 2012, and continue past his termination to the present. Thus, the actual totals of all overpayments likely exceeds millions of dollars.

103.   Centra knows of these overpayments because Relator and other employees notified management of the overpayments.

104.   Nevertheless, Centra has never reported the overpayments to Government Programs.

### *Retaliation Against Relator and Wrongful Termination*

105.   The False Claims Act, 31 U.S.C. § 3730 (h), prohibits the discharge, demotion, suspension, threatening, harassment or other discrimination against an employee because of any lawful act done by the employee on behalf of the employee or others in furtherance of an action under the FCA.

106.   After Relator raised questions about the unlawful practices described herein with corporate compliance director Keith, his colleagues began scanning files and moving the electronic copies to a shared network drive.

107.   Relator was not allowed to participate in the project.

21

108.    As the scanning project continued, and in an effort to conceal Defendant's fraud, fewer signed and undated certification files were contained in the filing cabinets, which became less jam-packed.

109.    On January 29, 2019, Relator's boss announced changes which he claimed would ensure the payer credentialing unit complied.

110.    The new practices – announced by Larkin on January 29, 2019 – raised additional concerns for Relator. These practices allowed the credentialing unit to continue to collect multiple, signed and undated copies of Medicare certification forms.

111.    Ten days later, on February 6, 2019, Relator told compliance these practices hadn't stopped and faked signatures still were being used.

112.    Centra initially responded by thanking Relator for his candor and pledging to investigate.

113.    However, Relator's candor translated into a tense and strained relationship with his boss and colleagues in the credentialing department.

114.    On February 14, 2019, a week after Centra promised to thoroughly investigate, Eddy Parham of the human resources department referred Relator to a counselor as part of the Centra's Employee Assistance Workplace Consultation program.

115.    In the referral, Parham wrote: "The compliance issues were founded but there was no indication that there was an intent to cause any harm and in fact no harm was caused. The department was under pressure to complete a large task and short cuts were implemented."

116.    To address the "strained working relationship," Centra ordered Relator and his two immediate bosses into a mandatory counseling program.

117.    The February 14, 2019 referral from human resources read, in part: "This is a strained working relationship where JP [Relator] reported a concern about possible compliance issues within the department. The compliance issues were founded but there was no indication that there was an intent to cause any harm and in fact no harm was caused. The department was under pressure to complete a large task and short cuts were implemented."

118.    The "strained relationship" was never resolved.  Instead, Relator was fired on March 5, 2019.

119.    Centra violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance of efforts to stop one or more violations alleged in this action. Defendant knew of Relator's protected activity as he had reported his findings to his superiors.

120.    As a result of Defendant's actions, Relator has suffered damages in an amount to be shown at trial, including but not limited to statutory damages, loss of pay, interest, attorney's fees, front pay, reinstatement, and make whole damages.

### COUNT 1
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)

121.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

122.    This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendant's violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

The Federal False Claims Act, 31 U.S.C.§ 3729(a)(l)(A), provides that any person who: (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent

23

claim for payment or approval ... is liable to the United States Government for any civil penalty of... plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

123.    Defendant knowingly presented and/or caused to be presented false or fraudulent claims for payment, both by submitting claims stemming from forged provider agreements, and failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

124.    The United States was unaware of the fraud and fraudulent schemes detailed herein and but for this disclosure, would not have discovered it, the mechanisms being used to perpetrate and mask the fraud, and the true breadth and scope of the fraud.

125.    The United States and the Government payors would not have paid the claims if they had known the claims were false because compliance with Medicare and Medicaid is a statutory condition of payment.

126.    As a result of these false or fraudulent claims submitted or caused to be submitted by Defendant, the United States Treasury, through Medicare, Medicaid and other federal health care programs' payments of these claims, has suffered damage in an amount to be determined at trial, plus a civil penalty per claim by statute for each such false claim presented or caused to be presented by Defendant.

## COUNT 2
## False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(B)

127.     All paragraphs of this Complaint are realleged and expressly adopted and

incorporated as if fully set forth herein.

128.     This is a claim brought by Relator and the United States to recover treble

damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31

U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising

from the Defendant's violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq*.

129.     The Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(B) provides that any person

who:

> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim ... is liable to the
> United States Government for any civil penalty of not less than $5,000 and
> not more than $10,000 ... plus 3 times the amount of damages which the
> Government sustains because of the act of that person.

31 U.S.C. § 3729.

130.     Defendant Centra knowingly made, used, or caused to be made or used false

records or statements material to a false or fraudulent claim to the United States Government

through the entities administering government funds pursuant to Government Programs, by

submitting claims stemming from forged provider agreements, and by further failing to identify

and/or self-disclose identified overpayments to the government within sixty (60) days, as

mandated by federal statute and agency rules and regulations applicable to health care providers

that receive funding from Medicare and Medicaid programs.

131.    The United States was unaware of the fraud and fraudulent schemes detailed herein and but for this disclosure, would not have discovered it, the mechanisms being used to perpetrate and mask the fraud, and the true breadth and scope of the fraud.

132.    The United States and the Government payors would not have paid the claims if they had known that records and statements associated with the claims were false because compliance with Medicare and Medicaid is a statutory condition of payment.

133.    As a result of Defendant's fraudulent course of conduct, with actual knowledge of falsity and/or in deliberate ignorance or reckless disregard that such records, statements, and representations were false, Defendant made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to the government for the Medicare program and Medicare made payments to Defendant and suffered damages. The United States Government is entitled to full recovery of the amount paid by the Government Programs for the false or fraudulent records or statements submitted by Defendant.

134.    As stated in the preceding paragraphs, the United States Treasury, through Medicare, Medicaid and other federal health care programs' payments of these claims, has suffered damage in an amount to be determined at trial, plus a civil penalty per statute for each such false record and/or statement made or used or caused to be made or used by Defendant.

**COUNT 3**
**False or Fraudulent Retention or Avoidance**
**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(G)**

135.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

136.    As set forth above, Centra by and through its agents, officers, and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an

obligation to pay or transmit money or property to the Government, and knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

137.    The term "obligation" means:

> an established duty, whether or not fixed, arising from an express or
> implied contractual, grantor-grantee, or licensor-licensee relationship,
> form a fee-based or similar relationship, from statute or regulation, or
> from the retention of any overpayment ...

31 U.S.C. § 3729(b)(3).

138.    Centra has a duty and obligation to notify, report and return any overpayments to the Secretary, state, intermediary, carrier or contractor as appropriate within sixty (60) days of identifying the overpayment or the date any corresponding cost report is due.

139.    Defendant has actual knowledge that significant Medicaid and Medicare overpayments exist. Instead of reporting and returning overpayments, it knowingly and intentionally concealed, or knowingly and improperly avoided, an obligation to pay money to the United States government.

140.    Defendant have known of these overpayments for more than sixty (60) days and no corresponding cost report is due.

141.    By virtue of Defendant's knowing refusal to repay overpayments to Medicare or Medicaid, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT 4
### Retaliation
**(False Claims Act 31 U.S.C. § 3730(h))**

142.    Relator hereby restates, incorporates and re-alleges all other paragraphs of this Complaint as if fully set forth herein.

143.    Relator came to his position in the credentialing department with a wealth of credentialing and audit knowledge, experience and expertise.

144.    Relator consistently had performance reviews.

145.    However, as recounted above, almost immediately after Relator first raised his concerns about Centra's forgeries and overpayment obligations both and voiced his findings, searching for root causes and identifying the grand scope of the problem, his superiors began a systematic effort to retaliate against him.

146.    Relator engaged in protected conduct on numerous occasions.

147.    Eventually, Centra terminated Relator.

148.    Relator's termination was in retaliation for his continued protected activity to identify and stop fraud in violation of the False Claims Act.

149.    The False Claims Act, 31 U.S.C. § 3730 (h), prohibits the discharge, demotion, suspension, threatening, harassment or other discrimination against an employee because of any lawful act done by the employee on behalf of the employee or others in furtherance of an action under the FCA.

150.    Relator engaged in activity protected by the False Claims Act when he advocated for Centra to take immediate and significant corrective action to address the fraud he identified both verbally and in writing.

151.    Centra violated Relator's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done in furtherance of efforts to stop one or more violations alleged in this action.

152.    Centra knew of Relator's protected activity, as he reported his findings to his superiors and to human resources.

28

153.    As a result of Centra's actions, Relator has suffered damages in an amount to be shown at trial, including but not limited to statutory damages, loss of pay, interest, attorney's fees, front pay, reinstatement, and make whole damages.

## COUNT 5
## Virginia Fraud Against Taxpayers Act

154.    All paragraphs of this Complaint are realleged and expressly adopted and incorporated as if fully set forth herein.

155.    This is a claim brought by Relator and the Commonwealth of Virginia to recover treble damages, civil penalties and the fees and cost of this action, under the Virginia Fraud Against TaxPayers Act, Va. Code Ann. §8.01-216.1 *et seq.*  Section 8.01-216.3 provides liability for any person who:

> 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> 2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> 3. Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7;
> …
> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

156.    Defendant violated the Virginia Fraud Against TaxPayers Act §8.01-216.1 *et seq.* by: (1) knowingly causing hundreds of thousands of false claims to be made, used and presented to the State; (2) causing false records or statements to get a false or fraudulent claim paid or approved by the State.

157.    Defendant Centra knowingly submitted thousands of false claims to the Commonwealth of Virginia predicated on forged provider agreements.

158.    Defendant Centra also knowingly presented and/or caused to be presented false or fraudulent claims for payment, failing to identify and/or self-disclose identified overpayments to the government within sixty (60) days, as mandated by federal statute and agency rules and regulations applicable to health care providers that receive funding from Medicare and Medicaid programs.

159.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied and also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendant's conduct.

160.    Had the Commonwealth of Virginia known that Defendant was violating the Federal and state laws cited herein and/or that the claims submitted in connection with Defendant's conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims caused to be submitted by Defendant.

161.    As a result of Defendant's violations of the Virginia Fraud Against Tax Payers Act, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars, exclusive of interest.

162.    Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia Fraud Against TaxPayers Act on behalf of himself and the Commonwealth of Virginia.

163.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the Federal claims and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

30

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

**To The United States:**

(1)     Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;

(2)     A civil penalty per statute for each false claim which Defendants caused to be presented to the United States;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

**To the Commonwealth of Virginia**:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's conduct;

(2) A civil penalty per statute for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator:**

(1) The maximum amount of relator's share allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act, and Va. Code Ann. § 32.1-315, §8.01-216.1 *et seq.*, and/or any other applicable provision of law, and any alternate remedy or the settlement of any such claims;

31

(2) allowable damages, interest, fees and costs resulting from Defendant Centra's

    retaliation;

(3) litigation costs, expenses and reasonable attorney's fees; and

(4) Such further relief as this Court deems equitable and just.

## JURY DEMAND

    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury for all triable claims and issues.

**Dated: May 30, 2019**

By:

  /s/ David Scher
David Scher (VA Bar # 47634)
dave@jameshoyer.com
James Hoyer, P.A.
1300 I Street NW Suite 400E
Washington, DC 20005
Ph: (202) 975-4994
Fax: (813) 375-3710


  /s/ Jay Holland
Jay Holland (to be admitted *pro hac vice*)
jholland@jgllaw.com
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Ph: (301) 220-2200
Fax: (301) 220-1214

*Attorneys for Relator John Paul Neblett*